UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AMERICANS FOR THE PRESERVATION OF THE
WESTERN ENVIRONMENT, A New Mexico non-profit
Corporation; ADOBE RANCH, a New Mexico ranching operation;
BEAVERHEAD RANCH; a New Mexico ranching operation;
ALAN TACKMAN, THE GILA NATIONAL FOREST LIVESTOCK
PERMITTEES' ASSOCIATION, Inc., a New Mexico
non-profit corporation; the OTERO COUNTY BOARD OF COMMISSIONERS and THE
CATRON COUNTY BOARD OF
COMMISSIONERS,

                                                    Plaintiffs,

v.

BENJAMIN TUGGLE, Director, Region 2, US. Fish and Wildlife Service;
TOD STEVENSON, Director, New Mexico Department of Game and Fish;
THE UNITED STATES FISH AND WILDLIFE SERVICE and
THE NEW MEXICO DEPARTMENT OF GAME AND FISH

                                                    Defendants.

## COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF
### (NEPA and APA)

## INTRODUCTION

This case alleges violations of the National Environmental Policy Act ("NEPA"), 42 U.S. C. §

4321 et seq. and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq., in relation

to the U.S. Fish and Wildlife Service's ("FWS") management decisions under the Mexican Gray

Wolf Reintroduction and Recovery Program.    The defendants have through actions and

omissions violated the enabling rules and altered the program without completing the

environmental review or other environmental documentation required by the National

Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370(d), and its implementing

regulations, 40 C.F.R. §§ 1500-1508, and these actions are therefore arbitrary, capricious, and

not in accordance with law under the Administrative Procedures Act, (APA), 5 U.S.C. § 551-706. Plaintiffs seek declaratory, injunctive, and other relief for Defendants' violations.

## JURISDICTION AND VENUE

1.      This action is brought pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S. C. § 4321 et seq, the Endangered Species Act, 16 U.S.C. §§ 1540(c) & (g), and the Administrative Procedure Act, 5 U.S.C. §§ 701–706. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 16 U.S.C. § 1540 (c) (the Endangered Species Act). 28 U.S.C. § 1346 (United States as defendant), and 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his duty).  Judicial review is authorized by 5 U.S.C. § 706 because plaintiffs are adversely affected within the meaning of the relevant statute.

2.      By letters dated April 16, 2010, and sent by certified mail, return receipt requested, and received no later than April 22, 2010, Plaintiffs notified all Defendants of their violations of the ESA and of Plaintiffs' intent to sue for those violations in accordance with the requirements of commencing an action under the ESA, 16 U.S.C. § 1540(g).  True and correct copies of the sixty (60) day notice letters are attached hereto as Exhibit "A -D".

3.      This Court has the authority to grant the relief requested pursuant to 16 U.S.C. § 1540 (g) (ESA); 5 U.S.C. §§ 701-06 (APA); 28 U.S.C. § 2201 (declaratory relief); 28 U.S.C. § 2202 (injunctive relief); and 28 U.S.C. § 2412 (Equal Access to Justice Act). 4. Declaratory relief is appropriate under 5 U.S.C. § 703 and 28 U.S.C. § 2201.  Injunctive relief is appropriate under 5 U.S.C. §§ 703 and 705 and 28 U.S.C. § 2202.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 16 U.S.C. § 1540(g)(3)(A) because the Plaintiffs reside in this district, have offices and members

who reside in this district, and are political subdivisions in this district, and the events or omissions giving rise to this cause of action occurred here.

## PARTIES

5.     Plaintiff Americans for Preservation of the Western Environment ("APWE") is a New Mexico non-profit corporation having its principal place of business in Reserve, New Mexico. APWE is an organization dedicated to informing the public of the facts about the Mexican Gray Wolf Reintroduction Program, and its members have experienced economic and other impacts as a result of the management decisions and violations of federal law described in this action.

6.     Gila National Forest Livestock Permittees' Association, Inc. ("GNFLPA") is a New Mexico non-profit corporation having its principle place of business in Grant County, New Mexico. The GNFLPA is dedicated to representing livestock growers in and around the Blue Range Wilderness Reintroduction Area. Members of the GLPA have experienced economic and other losses as a result of the management decisions and violations of federal law described in this action. .

7.     Plaintiff Adobe Ranch is a New Mexico for-profit ranching operation which has suffered direct economic, pecuniary losses as a result of the management decisions and violations of law by the Defendants under the Mexican Gray Wolf Recovery Program.

8.     Plaintiff Beaverhead Ranch is a New Mexico for-profit ranching operation which has suffered direct economic, pecuniary losses as a result of the management decisions and violations of law by the Defendants under the Mexican Gray Wolf Recovery Program.

9.     Plaintiff Alan Tackman is a resident of the State of New Mexico operating a ranching operation which has suffered direct economic, pecuniary losses as a result of the

management decisions and violations of law by the Defendants under the Mexican Gray Wolf Recovery Program.

10.     Plaintiff Otero County Board of Commissioners are the duly elected Board of Commissioners of Otero County, a duly organized political subdivision of the State of the New Mexico, and is legally responsible for the protection of the health, safety and welfare of individuals and communities within the County.   Citizens of Otero County have suffered economic, pecuniary losses as a result of the management decisions and violations of law by Defendants as described in this action.

11.     Plaintiff Catron County Board of Commissioners are the duly elected Board of Commissioners of Catron County, a duly organized political subdivision of the State of the New Mexico, and is legally responsible for the protection of the health, safety and welfare of individuals and communities within the County.   Citizens of Catron County have suffered economic, pecuniary losses as a result of the management decisions and violations of law by Defendants as described in this action.

12.     The legal violations alleged in this Complaint have caused direct injury to the economic, social and psychological well-being of the Plaintiffs.

13.     Defendant Benjamin Tuggle is the Director of the U.S. Fish and Wildlife Service. Defendant Tuggle is sued in his professional capacity.

14.     Defendant Tod Stevenson is the Director of the New Mexico Department of Game and Fish.   Defendant Stevenson is sued in his professional capacity.

15.     Defendant U.S. Fish and Wildlife Service ("FWS") is an agency of the United States and a subdivision of the Department of the Interior. FWS is responsible for the conservation of fish and wildlife, including the Mexican Gray Wolf under the ESA.

16.     Defendant State of New Mexico, Department of Game and Fish ("NMDGF") is a duly existing department of the State of New Mexico.   NMDGF has accepted and administered federal funding in its administration of the Mexican Gray Wolf Recovery Program in New Mexico, and is subject to the provisions of National Environmental Policy Act.

STATUTORY AUTHORITY

17.     The National Environmental Policy Act ("NEPA"), 40 C.F.R. § 1500.1, provides that among the critical purposes of the statute are to "insure that environmental information is available to public officials and citizens before decisions are made and actions are taken," and to "help public officials make decisions that are based on understanding of environmental consequences . . . ." Id. § 1500.1(b)-(c). "Public scrutiny [is] essential to implementing NEPA." Id.

18.     To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).  This statement is known as an Environmental Impact Statement ("EIS").

19.     An EIS must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) alternatives to the proposed action, (4) "the relationship between local short term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332.

20.     NEPA requires that when an agency proposes to undertake an "action" -- which includes activities that "are potentially under federal control," such as "new and continuing

activities, including projects and programs entirely or partially financed, assisted, conducted, regulated, or approved by federal agencies," as well as "federally assisted activities," 40 C.F.R. § 1508.18 -- the agency "must first determine whether the action is one that normally requires" the preparation of an EIS pursuant to NEPA and the Council on Environmental Quality ("CEQ") regulations implementing NEPA. 40 C.F.R. § 1501.4(a).

21.     If the agency is not certain whether an EIS is required, it must prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary. 40 C.F.R. § 1501.4. The EA must discuss the need for the proposal, evaluate alternatives that would cause less adverse environmental impacts, and provide sufficient evidence and analysis to support the agency's determination as to whether the proposed action will significantly affect the environment. Id.

22.     The only time environmental analysis is not required is when the agency has "categorically excluded" the action from NEPA review. 40 C.F.R. § 1501.4 (a).  However, a categorical exclusion may only be invoked for those actions which do not "individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementing [the CEQ] regulations." 40 C.F.R. § 1508.4.

## REGULATORY AUTHORITY

### Endangered Species Act – Section 10(j) – Nonessential, Experimental Designation

23.     USFWS classified the wolf as a nonessential experimental population, subject to release under the Endangered Species Act (ESA), section 10(j).

24.     Section 10(j) was intended to mitigate perceived conflicts with human activity from reintroduction of endangered or threatened species by clarifying and limiting ESA responsibilities incumbent with experimental populations in the hope of encouraging private parties to host experimental populations like the Mexican wolf.

## Final Environmental Impact Statement

25.     USFWS issued the Final Environmental Impact Statement (FEIS) for the Mexican Wolf Reintroduction Plan on April 3, 1997.

26.     The FEIS, as well as the subsequent Final Rule were designed with "considerable management flexibility.... to reduce potential conflicts between wolves and the activities of governmental agencies, livestock operators, hunters and others" FEIS at 2-16.

27.     The FEIS provided:

Initial release stock will be "surplus" Mexican wolves designated by the SSP Management Group from the U.S. captive population. A surplus wolf is one whose loss or removal will not significantly adversely affect the genetic or demographic make-up of the population (Siminski 1994a). Thus, death of one or more surplus wolves would not jeopardize the continued existence of the subspecies. Use of surplus wolves will allow the FWS to designate the wild population as nonessential experimental. This provides greater management flexibility than if released wolves retain their endangered status and associated ESA protections. (MW ALTERNATIVE A FEIS page 2-11)

28.  The  FEIS also provided:

The FWS or other authorized agencies will respond to all incidents of wolf-caused depredation with concerted efforts to prevent additional depredation....The FWS will permanently remove from the wild, or as a last resort, euthanize any wolves exhibiting a consistent pattern of livestock depredation (three or more confirmed kills within one year in primary wolf recovery zones and two or more in other areas.)  FEIS, at 2-16.

29. In response to Comments in the FEIS regarding economic impacts to ranchers, FWS

stated, "We actually state, in Chap. 4 – Impacts on Regional Economies, and under Cumulative

Impacts, that ranch failures are conceivable, but not expected. (FEIS, at 5-65). Further, FWS

stated, "We do not project that any ranchers will go out of business because of Mexican wolf re-

introduction." (FEIS, at 5-70)

## Final Rule

30.    On January 12, 1998, USFWS issued a Final Rule under Section 10(j) of the

Endangered Species Act, that it would reintroduce the endangered Mexican wolf into the Blue

Range Wilderness Reintroduction Area (BRWRA), which covers the entire Apache and Gila

National Forests in east-central Arizona and west-central New Mexico. *Endangered and*

*Threatened Wildlife and Plants; Establishment of a Nonessential Experimental Population of the*

*Mexican Gray Wolf in Arizona and New Mexico. (Final Rule), 63 Fed. Reg. 1752 (January 12,*

*1998) (codified C.F.R. 17.84(k))*

31. The Final Rule provided that, pursuant to NEPA, the FEIS on reintroduction of the

Mexican wolf in the southwestern United States had been prepared and is available to the public,

and should be referred to for analysis of the Preferred Alternative chosen in the Record of

Decision.  Id at 1762.

32.    The Final Rule provided that the

> "nonessential experimental designation enables the Service to develop measures
> for management of the population that are less restrictive than the mandatory
> prohibitions that protect species with "endangered" status.  This includes allowing
> limited "take" (see definition of take in section 17.84(k)(15) of the rule) of
> individual wolves under narrowly defined circumstances. Management flexibility

is needed to make reintroduction compatible with current and planned human
activities, such as livestock grazing and hunting. It is also critical to obtaining
needed State, Tribal, local and private cooperation. (emphasis added) Id at ()

33.     The Final Rule provided that "the Service and cooperating agencies will measure

the success or failure of the releases by monitoring; researching, and evaluating the status of

released wolves and their offspring.  Using adaptive management principles, the Service and

cooperating agencies will modify subsequent releases depending on what is learned from the

initial releases.  The agencies will prepare periodic progress reports, annual reports, and full

evaluations after three and five years that will recommend continuation, modification or

termination of the reintroduction effort." Id at 1754.

34.     The Final Rule provided "Designation of the released wolves as nonessential

experimental is considered necessary to obtain needed State, Tribal, local and private

cooperation. This designation allows for management flexibility to mitigate negative impacts

such as livestock depredation.   Without such flexibility, intentional illegal killing of wolves

would likely harm the prospects for success." (emphasis added) Id at 1755.

35.     The Final Rule provided "The main management goals are to protect wolves from

disturbance during vulnerable periods, minimize illegal take, and remove individuals from the

wild population that depredate livestock or otherwise cause significant problems." (emphasis

added) Id at 1755.

36.     The Final Rule stated that "key changes or clarifications were incorporated into

the final rule based on comments received on or related to the proposed rule, internal Service

reviews, changes in Service policy, and the Service's experience with section (10)(j) rules for

other nonessential experimental populations." Id at 1755-56.

37.     The Final Rule identified Comments that had been received during the NEPA public scoping process. One Comment listed is "The lack of definition of 'problem wolves' gives too much management flexibility. "Harass" must be more clearly defined.  "Rendezvous sites" needs definition.  In its Response to that Comment, the Final Rule states, "With the addition of a definition of "rendezvous site", all these terms are defined in the final rule. The Service believes management flexibility is positive.  Additional refinement of the definition of "problem wolves" could occur under the Service-approved interagency management plan that must be developed under the final rule."

38.     Another Comment in the Final Rule stated "The definition of "engaged in the act of killing, wounding or biting livestock" should be changed so that observing a wolf feeding on a livestock carcass would justify the assumption that the wolf had actually attacked and killed the animal, unless the carcass was obviously decomposed, so that the livestock owner could shoot the wolf."  In the Response to that Comment, the Final Rule states "The Service disagrees. Many livestock animals die from other causes.  Observing a wolf feeding on a livestock carcass is not an adequate reason to kill the wolf, but it would be a basis to harass the wolf.  If subsequent investigation of the carcass showed that the wolf did in fact kill the carcass, then a depredation control effort would be initiated and the rancher would likely be entitled to compensation." Id at 1760.

39.     With regard to "takings implications" under the Final Rule, it states, "One of the reasons for the experimental nonessential designation is to allow the agency and private entities flexibility in managing wolves, <u>including the elimination of a wolf when there is a confirmed kill of livestock.</u>" (emphasis added)  Id.

40.     The Final Rule provides "As determined by the Service to be appropriate, the Service or any agent so authorized by the Service may capture, kill; subject to genetic testing, place in captivity, euthanize, or return to the wild (if found to be a pure Mexican wolf) any feral wolf-like animal, feral wolf hybrid, or feral dog found within the Mexican Wolf Experimental Population Area that shows physical or behavioral evidence of hybridization with other canids, such as domestic dogs or coyotes: being an animal raised in captivity, other than as part of a Service-approved wolf recovery program; or being socialized or habituated to humans.  Id at 1764.

41.     In the Final Rule, "depredation" is defined as "the confirmed killing or wounding of lawfully present domestic livestock by one or more wolves" Id at 1771.

42.     In the Final Rule, "problem wolves" are defined as "wolves that-(1) have depredated lawfully present livestock; (2) are members of a group or pack (including adults, yearlings and young-of the year) that were directly involved in livestock depredations; (3) were fed by or are dependent upon adults involved with livestock depredations (because young animals will likely acquire the pack's livestock depredation habits), (4) have depredated domestic animals other than livestock on private or tribal lands, two times in an area within one year, or (5) are habituated to humans, human residences or other facilities.  Id at 1772,

43.     The Final Rule established the parameters of the FWS's reintroduction efforts.

44.     The Final Rule provides that "In the Blue Range Wolf Recovery Area, approximately 14 family groups will be released over a period of 5 years, with the goal of reaching a population of 100 wild wolves.  Final Rule, 63 Fed. Reg. at 1754.

45.    The Final Rule provides for management directives and allows limited legal

"takes" of wolves within a defined Mexican Wolf Experimental Population Area.  Final Rule, 63

Fed. Reg. at 1752.

46.    The Final Rule provided:

Some members of the experimental population are expected to die during the
reintroduction efforts after removal from the captive population. The Service finds that
even if the entire experimental population died, this would not appreciably reduce the
prospects for future survival of the subspecies in the wild. That is, the captive population
could produce more surplus wolves and future reintroductions still would be feasible if
the reasons for the initial failure are understood. The individual Mexican wolves selected
for release will be as genetically redundant with other members of the captive population
as possible, thus minimizing any adverse effects on the genetic integrity of the remaining
captive population. (Id at 1754)

Only wolves surplus to the captive breeding program will be released. (See section here
on Findings Regarding Reintroduction, & FEIS Appendix D-section 7. Consultation of
Proposed Action section on Effects on Mexican Gray wolf. (regarding definition of
surplus wolves and significance of their removal from the captive population.) Their loss
would not jeopardize the continued survival of the subspecies further, their nonessential
experimental classification allows for management flexibility deemed vital to successful
wolf recovery. Id at 1756.

47.    Under the Final Rule, protocols for various management measures, such as

grounds and procedures for permit issuance for the taking of wolves and the use of lethal

methods were to be spelled out in greater detail in the Service approved management plan

referenced in the Rule. Id at 1759.

**Interagency Management Plan**

48.    Subsequent to adoption of the Final Rule, in 1998, the USFWS adopted the

Interagency Management Plan (IMP), as the service approved management plan required by the

Final Rule to refine wolf management issues to spell out in greater detail wolf management

protocols, including, "flushing out" depredation control measures.

49.     Specifically, the IMP provided:

After two confirmed incidents within one year or nuisance behavior or the killing or
injuring of pets or other domestic animals on private lands by a wolf, the IFT will try to
deter this behavior. The IFT will move any captured offending wolves to a distant
location in the recovery area, except that pregnant or lactating females may be released
on-site or nearby. The IFT will permanently remove from the wild or euthanize any
wolves exhibiting a consistent pattern of nuisance behavior (three or more incidents per
year) (emphasis added)

50.     The IMP correlates to the FEIS model for active, professional, management of

depredating wolves calling for USFWS to permanently remove wolves exhibiting a consistent

pattern of livestock depredation (three or more confirmed kills within one year in primary wolf

recovery zones and two or more in other areas), and on private property to remove wolves

exhibiting a consistent pattern of nuisance behavior (three or more incidents per year). (FEIS at

2-16

## 2007 Actions

51.     In 2007, USFWS Southwest Regional Director Benjamin N. Tuggle, PhD,

decided that the reintroduction project would continue, but that modifications were needed and

should be analyzed through the environmental impact statement (EIS) process, as mandated by

the National Environmental Policy Act." (USFWS Mexican Gray Wolf website; *insert cite)*

52.     On August 7, 2007, USFWS published an Advance Notice of Proposed

Rulemaking; Notice of Intent and Notice of Public Scoping Meetings.   (Federal Register,

August 7, 2007, Volume 72, Number 151, 50 C.F.R. Part 17, RIN 1018-AV140).

53.     That proposed Rule stated "we have not yet identified proposed alternatives for

accomplishing our goals of amending the 1998 NEP final rule to better enable progress toward

reintroduction and recovery goals, and we do not know what the preferred alternative (the

proposed action) or other alternatives might entail.  Once identified, the alternatives will be

carried forward into detailed analyses pursuant to NEPA.  We will take the following steps prior

to making a decision regarding any proposed amendment to the 1998 Mexican Gray Wolf NEP

final rule. ….(9) conduct a socioeconomic analysis of the consequences of amending the existing

1998 NEP final rule."

54.     In July 2008, employees of USFWS prepared in internal memorandum, which

stated in pertinent part:

> Programmatic changes in management are needed to increase progress towards the
> current population objective of at least 100 wolves in the Blue Range wolf Recovery
> Area (BRWRA) and Fort Apache Indian Reservation (FAIR).  Section 10(j)(2)(a) of the
> ESA (1973) clearly articulates that releases must further the conservation of the species.
> The lack of population growth during the last 6 years of the project demonstrates the need
> for an adjustment of management strategies.  In some cases, addressing this broader
> mission may cause the current proposal to be in conflict with other  foundational
> documents (i.e. the Final Environmental Impact Statement (FEIS) and 10(j) rule), both
> addressed the need for adaptive management in the 3 and 5 year reviews.

55.     The Memorandum further stated:

> Management changes need to be addressed at an accelerated pace relative to an EIS that
> may be completed in 2012.  Thus, we have developed a series of recommendations that
> could be evaluated through an Environmental Assessment (EA) process that should
> greatly expedite the timeframe and allow for meaningful increases in the BRWRA prior
> to completion of an EIS.  At worst, the information within the EA could be incorporated
> into the EIS in the future.  Making "non-significant" changes in a National
> Environmental Policy Act (NEPA) context will be the key to success (See
> Recommendation #1).  Recommendations 2-7 do not require NEPA.

56.     Recommendation #1 in the Memorandum stated:

1. *Develop an EA tiered, to the 1996 FEIS, to address issues that are currently limiting population increases but which do not trigger NEPA significance, within the 1998 10(j) rule and management guidelines (e.g. Standard Operating Procedures [SOP's] based on the 10(j) rule*

   a. *Allow initial releases into the Secondary Recovery Zone (NM and a small portion of AZ)*

   b. *Change three depredation incidents within 365 days to a 180 day period*

   c. *Change definition of problem wolves to eliminate guilt by association. Pack members not known to have directly contributed to a depredation will not be assigned an incident.*

   d. *Change the definition of breeding pair within the Final Rule from 1 male and 1 female that produce 2 pups that survive until December 31 of the year of their birth (See Population Growth Goal below for discussion).*

   e. *Change FEIS directive to remove wolves after three nuisance events on private lands, or killing of domestic animals, to be more consistent with the SOP 13.0 Clarification Memo.*

57.    The Memorandum outlined the Example Population Objective for 2008 as follows:

   1. *At least six resident packs that have ≥ 1 adult (ad) male, ≥ 1 ad female, and ≥ 1 pup (YOY), which is equivalent to an increase of 2 breeding packs; and*

   2. *An aggregate number of wild-born pups (YOY) ≥ 12; and*

   3. *An end-of-year count total of ≥ 62 wolves (20% population increase in all age classes).*

      *Replacement of ad males and ad females that conceived YOY pups, but which subsequently died or were killed, is permissible but the pack itself must be a cohesive family unit on December 31.*

      *If all three elements of the 2008 Population Objective are not achieved (as measured in the 2008 end-of-year count) then in 2009 ad males and ad females in packs (≥ 3 wolves including ≥ 1 ad male and ≥ 1 ad female) that have established territories shall not be removed to resolve depredation or nuisance problems.*

58.    The Memorandum further outlined the Example Population Objective for 2009, as follows:

1. *At least eight resident packs that, from July 1 through December 31, all have $\geq 1$ ad male, $\geq 1$ ad female, and $\geq 1$ pup (YOY); and*
2. *An aggregate number of wild-born pups (YOY) $\geq 16$; and*
3. *An end-of-year count total of $\geq 74$ wolves (20% population increase in all age classes).*

*Replacement of ad males and ad females that conceived YOY pups, but which subsequently died or were killed, is permissible but the pack itself must be a cohesive family unit on December 31.*

*If all three elements of the 2009 Population Objective are not achieved (as measured in the 2009 end-of-year count) then in 2010 ad males and ad females in packs ($\geq 3$ wolves including $\geq 1$ ad male and $\geq 1$ ad female) that have established territories shall not be removed to resolve depredation or nuisance problems.*

59.     The Memorandum set forth its "Example Population Objective for 2010 and beyond," as follows:

1. *At least a 20% population growth and an increase of 2 breeding pack for each successive year until the population goal of $\geq 100$ wolves, $\geq 10$ breeding packs, and $\geq 20$ wild-born pups is established.*
2. *Each year after the population goal of $\geq 100$ wolves, $\geq 10$ breeding packs, and $\geq 20$ wild-born pups is established, these benchmarks (as measured in the end-of-year count) will be used to determine the following years management scenario.*

*If all three elements of any given years Population Objective are not achieved (as measured in the end-of-year count) then in the following year ad males and females in packs ($\geq 3$ wolves, including $\geq 1$ ad male and $\geq 1$ ad female) that have established territories shall not be removed to resolve depredation or nuisance problems.*

60.     The Memorandum listed a Stipulation, as follows:

*These extraordinary measures to facilitate wolf population growth through emphasis on breeding packs shall be implemented if and only if the cooperating agencies provide range rider support, hazing support, less-than-lethal projectile capability, and/or other interdiction and incentive measures to the permittee(s) affected by breeding pack depredations. Absent deployment of such measures, removal shall occur in accordance with SOP 13.0 and the Clarification Memo thereof.*

61.    The Memorandum listed Pros and Cons of the proposed management changes.

The Cons stated, in pertinent part as follows:

> *1b -- Will be perceived by some stakeholders to be a significant departure from
> and abrogation of USFWS management commitments in the FEIS and 10j.*
>
> *1c - Perception of changing the rules and not acknowledging the potential for
> pups to be involved in depredations or acquiring a taste for livestock.*
>
> *1e – The majority of these changes reduce the level of management responses that
> can be applied and could be viewed as backing away from our original
> commitments within the FEIS and Final Rule.*
>
> *3 – These benchmarks may be unattainable in the BRWRA under the current 10j
> rule, EIS and standard operating procedures.*

62.    In the June 28, 2009 Summary Notes for the Adaptive Management Work Group

meeting, it states:

> Update on NEPA process for reconsidering the Project's 10(j) rule. Bud Fazio
> (USFWS) said that his agency is continuing the possibility of making two changes
> in the 10(j) rule: modification of the definition of breeding pair, and allowing
> initial releases in the Secondary recovery Zone. USFWS announced last
> September and October that it was developing an Environmental Assessment for
> that purpose, but a decision has not been made on whether or when the document
> will be released for public comment. Fazio said funding is not yet available to
> continue work on an EIS for considering broader changes in the 10(j). USFWS
> estimates that the EIS process would take about five years after funding becomes
> available. (Summary Notes, pg. 5).

### May 2010 Conservation Assessment

63.    In May 2010, the FWS released the Mexican Wolf Conservation Assessment,

which provides:

> Based on data analyses in the 3-Year and 5-Year Review, and subsequent IFT annual
> reports, several of these mechanisms appear to be hindering the growth of the population
> toward of the objective to establish a population of at least 100 wild wolves – the internal
> and external boundaries of the BRWRA and SOP 13. Further, failure to develop an up-
> to-date recovery plan results in inadequate guidance for the reintroduction and recovery

effort.  The Service has not adjusted its regulatory mechanisms, and only recently made adjustments to its management mechanisms.  In May, 2009, a Clarification Memo to SOP 13 to better support the biological progress of the population was approved.  In December of 2009, the United States District Court of Arizona approved a settlement agreement between the Service and several environmental NGO plaintiffs that had challenged the MOU and SOP 13 (Defenders, et al. v. U.S. Fish and Wildlife Service et al., 08-cv-280 (D. Ariz.)) The settlement agreement read, in part, "The Service shall make no further decisions that relate to the Mexican Wolf Recovery Program pursuant to SOP 13 as issued on April 30, 2005, or as altered by the Clarification Memo on May 28, 2009."  A new management framework has yet to be established, however, the Service and its partners remain committed to managing wolves to support the biological processes of the population, while minimizing potential economic impacts of wolves to livestock and other interests.  (emphasis added)  May 2010 Conservation Assessment, pg. 10.

## Management Decisions Violating the Final Rule and FEIS

64.     Both prior and subsequent to the issuance of the internal memorandum, the FWS engaged in management actions which violate the Final Rule and FEIS by failing to remove problem wolves which have repeatedly depredated on livestock.

65.     No wolves have been removed due to livestock depredations since December 2007.

## December 2007 depredations

66.     The January, 2008 Endangered Species Update issued by the Arizona Game and Fish Department stated: "On December 27 [2007], the IFT received a report of a dead cow in Apache County, Arizona.  The IFT investigation showed the cause of death to be wolf-related.  Based on all available evidence, the IFT assigned the depredation incident to Paradise Pack AM795 and one uncollared wolf associated with AM795.  This is the first depredation incident for AM795 and the uncollared wolf associated with AM795 in 365 days.

## March 2008 Depredations

67.     The IFT Recommendation for San Mateo AM1114, dated June 17, 2009 states

that on March 29, 2008, the IFT investigated a freshly killed calf and confirmed that wolves were

responsible for the mortality. This was the first depredation incident for AM1114 and the second

for AF903 in a 365 day period.   That report further states that on April 9, 2008, due to expiration

of the depredation incident on April 9, 2007, AF903 dropped from two depredation incidents to

one depredation incident in a 365-day period.

68.     The 2008 IFT Annual Report showed a total of four depredations occurred in

March 2008.

## April, 2008 Depredations

69.     In the April 2008 Monthly Update of the Interagency Field Team ("IFT"), it states

"On April 7, the IFT investigated a reported calf depredation in Catron County. The IFT

determined that the depredation was a confirmed wolf kill. Based on telemetry evidence at the

site, the depredation incident was assigned to members of the Middle Fork pack (AM871,

AF861, and F1115).

70.     The IFT 2008 Depredation Report Summary Sheet shows that a depredation

occurred on April 14, 2008 which was assigned to F1112.

71.     In the IFT Update to AMOC dated July 28, 2008, it states that on April 22, 2008,

a dead cow was found at the O Bar O Canyon, NM, and confirmed as a depredation by

uncollared wolves.

72.     In the IFT Update to AMOC dated July 28, 2008, it states that on April 29, 2008,

a depredation incident on a yearling cow on the FAIR was a confirmed wolf depredation and

assigned to uncollared wolves.

73.    In the IFT Update to AMOC dated July 28, 2008, it states that on April 30, 2008,
a depredation incident on two dead yearling cows on the FAIR was a confirmed wolf
depredation and assigned to uncollared wolves.

### May 2008 Depredations

74.    In the IFT Update to AMOC dated July 28, 2008, it states that on May 7, 2008, a
dead cow and yearling found on the FAIR were confirmed wolf depredations, and were assigned
to uncollared wolves.

### June 2008 Depredations

75.    In the IFT Recommendation for San Mateo AM1114, dated June 17, 2009, it
states that on June 26, 2008, the IFT discovered a dead cow on private land near the San Mateo
Pack. The IFT confirmed the dead cow was a wolf kill. This was the second depredation
incident for AM1114 and AF903 in a 365-day period.

### July, 2008 Depredations

76.    In the IFT Update to AMOC dated July 25, 2008, it states that on July 5, 2008, in
Corduroy Draw, NM a dead calf was found and confirmed as a wolf-caused depredation. The
depredation incident was assigned to an uncollared wolf.

77.    The IFT Recommendation San Mateo AM1114 dated June 17, 2009 states that on
July 13, 2008, a 2-week old dead calf was discovered on East Sands Flat allotment, New Mexico.
Telemetry indicated that only AM1114 was in the area. The IFT determined this to be a
probable wolf depredation.

78.    The IFT Update to AMOC, dated July 25, 2008, states that on July 15, 2008, on
the Fort Apache Indian Reservation (FAIR) in Arizona, a dead calf was found and confirmed as
a wolf depredation incident and assigned to the Lofer Pack.

79.     On August 29, 2008, John Oakleaf, an employee of FWS, issued the following

email:

> On 7-30-08, WS [Wildlife Services] conducted an investigation on an injured calf
> in the Sand Flat area of New Mexico. The calf had injuries on its right hip, left
> flank and Hip. The injuries had occurred approximately 5 days previous. WS
> confirmed the injuries as wolf caused.  There was not a USFWS co-investigation.
> The calf remained alive following its injuries and thus there was not a depredation
> incident assigned associated with the injuries.

80.     Because the Final Rule defines "depredation" to include the wounding of

livestock, the USFWS had a non-discretionary duty to consider wounding as a depredation

incident.

### August 2008 Depredations

81.     On August 29, 2008, John Oakleaf issued an email which stated:

> All,  there was a depredation investigation on 8-12-08 in the CC Flat area of
> Arizona. The permittee called in the potential depredation the previous day. The
> calf was estimated to have died on August 9, 2008, and weighed approximately
> 250-300 pounds. The calf was 95-98% consumed at the time of the investigation.
> WS discovered bite marks in the 43.32 range with associated hemorrhaging in the
> groin area. No scats or tracks that could be identified as wolf were located in the
> area because the grassy area precluded track id adjacent to the carcass. Radio
> Telemetry data indicated AM795 of the Paradise Pack was located 8-10 miles
> away during the time of the depredation. Thus, the IFT assigned the incident to
> uncollared wolf or wolves. The IFT could not trap off the carcass because bird
> dog trails were occurring in the area and the carcass was mostly consumed. There
> was not a USFWS co-investigation of the site because USFWS personnel were
> unavailable at the time of the investigation. The livestock were legally present in
> the area. See email below. A depredation checklist was completed by the acting
> AGFD FTL and is filed and available at the IFT office.

82.     Again, on August 29, 2008, John Oakleaf issued an email stating:

> On August 7, 2008, WS investigated a dead yearling cow that was called in by the
> rancher the same day. The cow was estimated to have died on 8-4-08.  Bite
> marks measured at 42.25mm, 37.65 mm, and 37.04 mm. Hemorrhaging occurred
> in the neck/throat area and compression bites on the right rear hamstring, right
> hock, upper back and neck. There was wolf scat in the area.  25% of the carcass

was eaten. F1118 of the Luna Pack was in the area on Mondays flight (8/4/08). The depredation incident was assigned to F1118 and an uncollared wolfe in the Luna Pack. This is the first depredation incident assigned to F1118. The Luna Pack is targeted by the IFT for potential trapping for additional collars in September. The livestock were legally present in the area. See email below. A depredation checklist was completed by the acting NMDGF FTL and is filed and available at the IFT office. There was an USFWS co-investigation, but no contributing factors in the depredation could be determined.

83.  Again, on August 29, 2008, John Oakleaf issued the following email:

All, There was another investigation on an injured calf in the East Sand Flat area of NM. The calf was discovered by the permittee injured on 8-04-08. The same day WS investigated. AM1114 of the San Mateo Pack was in the area. Bite marks were observed on the hind end of the calf. Bite marks were measured as 42.14 mm, 37.30 mm, 41.76 mm, 36.88 mm and 37.27. There was one set of tracks observed in the area. There was a USFWS co-investigation. Discussion with the permittee indicated that the calf injured on 7-30-08, this calf and the probable killed calf on 7-13-08 were all first calf heifers. The rancher indicated that these calves were generally younger than the rest of the calves. Perhaps lack of mothers experience protecting calves and the age of the calves are contributing factors in these depredations. No depredation incident was assigned because this calf was not killed.

84.  Again, on August 29, 2008, John Oakleaf issued another email, as follows:

All, there was a depredation injury investigation in the Sand Flat area of New Mexico on 8-15-08. The calf was discovered by the permittee the previous day. The injuries were to the same calf that was confirmed injured on 7-30-08, but were new injuries to the calf. The new injuries consisted of bite marks of 36.53 mm and 40.28 mm. M1114 was in the area where the injuries occurred. There was not a depredation incident assigned because the calf was not killed and has not subsequently died. There was not a USFWS co-investigation because the calf was brought to the home corrals and was not in the area where the injuries occurred.

### September 2008 Depredations

85.  In the IFT Recommendation San Mateo AM1114 dated June 17, 2009, it states

that on September 8, 2008, the IFT received and investigated a permittee depredation report for

the Canyon Del Buey Allotment, New Mexico. The investigation determined that a cow calf had

been killed on September 3. USDA-WS confirmed the depredation incident as a kill by a single

wolf. All six Lead Agency representatives agreed the incident should be assigned to AM1114, based on bite marks.

86.    In the IFT Recommendation San Mateo AM1114 dated June 17, 2009, it states that on September 8, 2008,the IFT received and investigated a permittee depredation report for the East Sands Flat Allotment (NW of Indio Canyon Tank), New Mexico. The investigation determined that a cow calf had been killed; the carcass was discovered and reported by the permittee about 12 hours prior to the IFT investigation. USDA-WS confirmed the depredation incident as a kill by a single wolf. All six Lead Agency representatives on the IFT agreed the incident should be assigned to AM1114, based on bite marks.

87.    In the October 27, 2008 Interagency Field Team Update, it reports that on September 11, 2008, a dead cow was confirmed as a wolf depredation and assigned to uncollared wolf or wolves. (10/27/08 IFT Update, pg. 2).

88.    In the October 27, 2008 Interagency Field Team Update, it reports that on September 11, 2008 a dead cow was a confirmed wolf depredation assigned to the entire Bluestem Pack. (10/27/08 IFT Update, pg 2).

## 2008 Annual Depredations

89.    The 2008 IFT Annual Report states:

*Wolf Depredation*

USDA-WS members of the IFT completed 83 investigations with potential Mexican wolf involvement. Of these 83 investigations, 77 involved livestock including cattle (n=72), horses (n=3) and sheep (n=2). In addition, the IFT conducted six non-livestock investigations involving dead or injured alpacas, chickens and goats.

.... Of the 77 individual livestock investigated, 38% (n=29) were determined to have confirmed or probable wolf involvement resulting in livestock injury or death.... Twenty-one investigations of livestock fatalities were classified as confirmed (n=20) or probable (n=1) wolf caused mortalities.    Also, seven confirmed injuries and one probable livestock injury were investigated.  Fifty-one percent (n=11) of the livestock fatality investigations were determined to have confirmed or possible wolf involvement occurred in New Mexico and 48% (n=10) occurred in Arizona.    Seven of the eight IFT investigations involving wolf-caused injuries occurred in New Mexico.

... In total, 10 of the 20 (50%) confirmed depredations involved uncollared wolves. Seven of the 27 (26%) confirmed injuries and depredations involved M1114.    No wolves were permanently removed in 2008 due to repeated depredations.  The confirmed killed cattle rate for 2008 extrapolates to 36.5 depredations/100 wolves using the number of confirmed killed cattle (n=19, table 7) compared to the final population count (n=52). This projected number of depredations was slightly higher than the 1-34 confirmed killed cattle per 100 wolves predicted in the FEIS.

90.     The 2008 IFT Annual Report also states:

Not all dead livestock were found, or found in time to document cause of death. Accordingly, depredation numbers in this report represent the minimum number of livestock killed by wolves.

The 1996 Final Environmental Impact Statement (FEIS) predicted 1-34 confirmed killed cattle per year with a population of 100 Mexican wolves. ...The Mexican Wolf Blue Range Reintroduction Project 5-year Review (AMOC and IFT 2005) reported, between 1998 and 2003, the mean number of cattle confirmed killed per year by wolves was 3.8, which extrapolates to 13.8 cattle killed per year from a population of 100 Mexican wolves.  From 2005 to 2007, the number of confirmed cattle killed by wolves exceeded the predicted rate by the FEIS.  (emphasis added)

**February 2009 Depredations**

91.     The report of the Interagency Field Team for October 28, 2008 through May 27, 2009 lists a confirmed wolf depredation on February 10, 2009 in Cerro Montosa, AZ, assigned to one uncollared wolf.


**May, 2009 Depredations**

92.    The report of the Interagency Field Team for October 28, 2008 through May 27,

2009 lists a confirmed wolf depredation on May 12, 2009 in Sand Flat, NM assigned to F1106,

and states it was the first depredation incident assigned to F1106 in 365 days.

93.    The report of the Interagency Field Team for October 28, 2008 through May 27,

2009 lists a probable wolf depredation on May 19, 2009 in Mangas Mountains, NM. It states a

depredation incident was not assigned because of the probable designation.

### June 2009 Depredations

94.    In the June 30 Monthly Update of the IFT, it was noted that:

On June 15, WS personnel investigated a dead calf near Cat Spring, New Mexico, and
determined that it was killed by wolves. The IFT assigned the incident to AM1114 and
AF903 of the San Mateo Pack. At the time of the incident, this was the fourth assigned
depredation for AM1114 and the second assigned depredation incident for AF903 in 365
days. On June 19, the FWS issued a management decision allowing AM1114 to remain in
the wild. The decision was made in consideration of the overall low population numbers
of Mexican wolves in the BRWRA and the importance of AM1114 in supporting
dependent wild-born pups. By the end of June, a depredation assignment on each of these
wolves expired, leaving AM1114 with three depredation incidents and AF903 with a
single depredation incident.

### August 2009 Depredations"

95.    In the August 2009 Monthly Update of the IFT, it states that:

During the month of August, the IFT assigned six depredation incidents to AF861 and
AM871 of the Middle Fork Pack in New Mexico. All of the incidents occurred in the
vicinity of Houghton Canyon. The dates and livestock killed are as follows: August 3,
yearling steer; August 7, yearling steer; August 22, yearling heifer; August 26, two
separate incidents involving yearling heifers; and August 31, yearling steer. On August
28, the FWS issued a management decision regarding these wolves that called for
intensive hazing to be conducted on the Middle Fork Pack with the goal of deterring
future livestock depredations and to potentially move the wolves out of the immediate

vicinity. The FWS developed this decision with regards to overall low population numbers of Mexican wolves in the BRWRA, presence of pups with the adult wolves, and the genetic importance of the adult members of this pack.

## September 2009 Depredations

96.    In the September 2009 Monthly Update of the IFT, further depredations by the

Middle Fork Pack were noted:

> During September, the IFT assigned four depredation incidents to AF861 and AM871 of the Middle Fork Pack in New Mexico. All of the incidents occurred in the vicinity of Houghton Canyon. On September 5, the IFT confirmed two separate incidents involving a yearling heifer and a yearling of unknown sex. On September 24, the IFT investigated a dead yearling and confirmed it as wolf-related. Also on September 24, an injured yearling heifer was discovered and was later euthanized by the permittee due to its injuries. These four confirmed depredation incidents in September bring AF861 and AM871 to ten confirmed depredation incidents within a 365-day period. On August 28, FWS issued a management decision regarding these wolves that called for intensive hazing to be conducted on the Middle Fork Pack with the goal of deterring future livestock depredations and to potentially move the wolves out of the immediate vicinity. On September 4, FWS issued a second Directors Decision Memo to leave both AF861 and AM871 in the wild with their four pups, and to escalate the existing hazing efforts and take other actions to reduce the risk of further depredation. On September 10, FWS issued a Directors Decision Memo reaffirming the September 4 decision, stating that AF861 and AM871 will remain in the wild through the fall season until November 1, 2009, at a minimum without the necessity of further decisions. FWS developed these decisions with regard to overall low population numbers of Mexican wolves in the BRWRA, presence of pups with the adult wolves, and the genetic importance of the members of this pack.

97.    At a meeting held in December 2009 at the USFWS headquarters in Albuquerque,

stakeholders asked what the current policy is on wolf removals with regard to depredation

incidents and the response was that all options are on the table.  Bud Fazio of the USFWS stated

that removals involving "Nuisance" wolves had been "taken off the table by Dr. Tuggle" even

though still in the Final Rule.

## WOLF MONITORING

98.    In the 2010 Conservation Assessment, it states:

> The population projections in the FEIS have provided the benchmark against
> which the progress of the Blue Range population growth is measured.  Between
> 1998 and 2003, the Blue Range population tracked fairly closely to FEIS
> projections for population count reaching (a minimum of) 55 wolves in 2003, but
> was consistently below the FEIS estimated number of breeding pairs.  The
> population decreased significantly in 2004-2005, and then rebounded to a high of
> 59 wolves in 2006, the year in which the FEIS projected the target population of
> 100 would be met.  The population decreased to 52 wolves in 2007, where it
> remained through 2008, with the number of breeding pairs decreasing annually
> from seven pairs in 2006 to two pairs in 2008.  In 2009, the population decreased
> again to 42 wolves, with the number of breeding pairs remaining constant at 2.
> Thus in the last 6 years the growth of the Blue Range population has become
> unsteady, hovering around the half-way point of the population target, and
> consistently falling short of the FEIS predictions for the number of breeding pairs.
> (2010 Conservation Assessment, pg. 26).

99.    The 2010 Conservation Assessment concedes that the annual population counts

are "minimum counts".  (C.A., pg. 75).

100.    The IMP provides that "data on survival, reproduction, food habits, kills rates,

characteristics of prey, pack size, litter size, movements, habitat use, and territory size of re-

established free-ranging Mexican wolves will be collected through a variety of techniques.

These include, but are not limited to:  radio-telemetry, direct observation, kill site investigation,

snow tracking, scat survey/analysis, scent station surveys, and howling observations." IFT, pg.

12.

101.    In the 2006 Interagency Field Team Annual Report, dated April 2007, under

"Population Estimation", it states, "The IFT expanded efforts in 2006 to make the year-end

population estimate more comprehensive.  This included increasing ground surveys for

uncollared wolves, flight hours for helicopter operations, coordination of wolf sightings by the

public and other agencies, and use of remote camera traps" (2006 IFT Annual Report, pg. 4).

102.    The 2006 IFT Annual Report states "at the end of 2006, there were 26

radiocollared wolves (15 adults, three-subadults, and eight pups) and 33 documented uncollared

wolves. Twenty-two of the 33 uncollared wolves, including 13 pups of the year, were associated

with 12 known packs, seven in Arizona and five in New Mexico. In addition, there were eight

known single wolves (one in Arizona and seven in New Mexico). (2006 IFT Annual Report, pg

5).

103.    The 2006 IFT Annual Report further states, "Information on the number of

wolves and specific locations from FAIR [Fort Apache Indian Reservation] and the San Carlos

Apache Reservation (SCAR) is not included in this report, in accordance with Tribal agreements.

Id at pg. 5.

104.    In an email of unknown date, prepared by Terry B. Johnson, of the Arizona Game

and Fish Department, regarding the 2006 wolf population, it states :

> *In addition, there are 2 groups of wolves without collars in Arizona that the IFT has*
> *gathered enough information on that provides compelling evidence of their existence.*
> *These are: 1 group of 3 uncollared wolved on WMAT and 1 group of 4 uncollared wolves*
> *elsewhere in the BRWRA in Arizona.*
>
> *New Mexico:*
>
> *\*San Mateo: 4 wolves (1 collared)*
>
> *Single 992: 1 wolf (1 collared)*
> *Single 86:3 1 wolf (1 collared)*
> *Single 923:1 wolf (1 collared)*
> *\*Saddle 5: wolves(4 collared)*
> *\*Luna 5: wolves (1 collared)*
> *Single: 925 1 wolf (1 collared)*
> *\*Aspen: 6 wolves (4 collared)*
> *Middle Fork 2 wolves (2 collared)*
> *= 26 wolves (16 collars) in 5 groups and 4 singles in New Mexico*
> *\* = confirmed breeding pair at the end of 2006 meeting the definition of the 10(j) rule*

*In addition, there are 3 single uncollared wolves in New Mexico that the IFT has
gathered enough information on that provides compelling evidence of their existence.*

*In summary:*
*# of collared wolves seen during survey = 29*
*# of uncollared wolves seen during survey = 20*
*Total number of wolves seen during survey – 49*
*# of wolves not seen, but preponderance of evidence indicate their existence = 10*
*Final End of Year 2006 Population Count = 59*

*Note: the 59 animal count represents the minimum number of wolves in the BRWRA.
Although we believe this represents a very complete survey of the BRWRA and a very
accurate population estimate, we also recognize there may be several more uncollared
animals in the wild that remain uncounted because they were not seen during the survey
or because we had no observations or unique sign or reliable reports to alert us to their
existence.*

105.    In the December 13, 2007 Draft Final Summary Notes for the Interagency

Director's Meeting, under "INITIAL RELEASE F836", it states, "Dave Bergman provided

explanation of rationale behind his not supporting the initial release. He explained the conflict

with the end-of-year count, noting that this year's effort was less than last year's and that he felt

that this would compromise the count effort." Further discussions in those meeting notes make

reference to "chronic shortages of resources within the IFT", specifically stating "Terry also

highlighted the problems and trickle down impacts that flow from having IFT staffing at

inadequate levels. Run into very real problems in being able to keep up with management

activities (e.g. end of year counts) that are closely watched/relied upon by the public (and

cooperators). These issues impact range-wide operation of the project."

106.    In those same meeting notes, under "IFT UPDATE", it states, "Bruce Thompson

asked about the count, noting concern over the fixation on a single number. Questioned if there

is a more effective way of expressing the county/population without resulting on a fixation on a

single number – also asked about how IFT arrives at this single number. He sees a disadvantage

with the single number. Dr. Tuggle noted that he joined the project, he had concerns with the use of ranges on the population. He feels that a number should be generated, based on the best of our abilities to generate that number, in order to articulate and evaluate overall progress. He stated that he takes responsibility over use of a single number, and the shift away from ranges. Bruce noted that he feels that a single number still has downsides associated with it, given the tendency of people to fixate on that number. " Id at pg. 6.

107.    In the 2007 Interagency Field Team Report, dated May 2008, under "Population Status" it states, "at the end of 2007, 20 radio-collared wolves (14 adults, 5 subadults and one pup) and 32 uncollared wolves were documented in the Mexican Wolf Nonessential Population Zone." (IFT 2008 Annual Report, pg  6. ) The same report notes however that "information on the number of wolves and specific locations from FAIR and the San Carlos Apache Reservation (SCAR) is not included in this report, in accordance with Tribal agreements. (Id. pg 5).

108.    The 2007 Report states that the IFT monitored 39 individual radio-collared wolves in 2007, and that 17 of those wolves were considered managed (removed), dead, or missing.  The remaining number of 22 collared wolves does not account for why the IFT only included 20 collared wolves in its end-of-year count. Id at  pg. 7.

109.    In the 2007 Report, under "Uncollared Wolf Sign", it states, "The IFT caputed and radio-collared a previously unknown wolf on the FAIR.  The capture led to confirmation of a wolf pack, subsequently named the Lofer pack. (Fig. 3).  The IFT documented three groups of uncollared wolves in Arizona: one on the SCAR, one in Coleman, and one in Auger Canyon (Fig 6.)" (Id at pg. 10)  Based on the statements in the Report, the uncollared group of wolves on the SCAR is not included in the end-of-year count.

110.   The 2007 report states "there are likely additional, undocumented free-ranging wolves in the population. However, the majority of undocumented wolves are likely single animals, as a wolf pack usually leaves more sign and its existence is easier to document." Id at 11.

111.   The 2006 IFT Annual Report shows that a total of 5,099 miles of area were searched for uncollared wolf sign for the 2006 end of year count, including 2,846 miles in Arizona and 2,253 miles in New Mexico (IFT 2006 Annual Report, page 20)

112.   The 2007 IFT Annual Report shows that less than half the 2006 number of miles searched for uncollared wolf sign in 2006 were searched in 2007.   In 2007, only 2252 miles were searched, being 719 in Arizona and 1533 in New Mexico. (2007 IFT Annual Report, Figure 5).

113. The 2008 IFT Annual Report shows that only 2836 miles were searched for uncollared wolves in 2008, being 875 miles in Arizona and 1533 miles in New Mexico. (2008 IFT Annual Report, pg. 30).

114.   The 2008 Mexican Wolf Annual Work Plan identifies the need for 30.62 Full Time Employees (FTEs) to manage the project, but only 18.80 FTE's available, showing a shortfall of 9.63 FTE's for the Project. (2008 Annual Work Plan, pg. 7).

115.   The May 7, 2009 Summary Notes for Meeting on April 14, 2009 of the Mexican Wolf Adaptive Management Oversight Committee states:

1.   ...All Lead Agency Directors committed to ensuring that significant gaps in IFT coverage do not occur due to employee resignation, leave and other priority assignments. However, some positions in NMDGF and USFWS have remained unfilled for months, and TDA's are not being used to fully cover short-term or other vacancies, resulting in gaps in IFT coverage and pressuring IFT members to handle the workload. (Id, pg.

....

4.      Resolve whether funding is sufficient to cover helicopter and fixed-wing flight support for Project in FY2009 (assigned 5/20/08). Update July 31: total projected need $179,217 for fixed-wing and helicopter flights (including weekly monitoring, capture/removal, end-of-year count and contingency flights). NMDGF providing at least $47,000 and AGFD providing at least $98,202, so minimum shortfall is $34,015 and maximum shortfall would be $85,217 if AGFD cuts back to $47,000 (i.e. same level as current NMDGF commitment).   a. Terry Johnson (assigned 1/3/09): advised AGFD Director that per 1/13/09 AMOC conference call NMDGF will not commit additional funding for flights to meet its one-third share obligation (AFGD, NMDGF, WMAT [AGFD covers WMAT share]) of the total annual costs.

116.    From 2007 through at least 2009, the Reintroduction Program has experienced

budget shortfalls in New Mexico, which have resulted in reduced wolf monitoring in the areas of

radio-collaring , year-end population counts and response to wolf sightings.

## HYBRIDIZATION

117.    In the 1996 FEIS, it stated:

Mexican wolves could potentially interbreed with domestic or feral dogs or coyotes. Past inter-breeding between wild northern gray wolves and coyotes has been documented in Minnesota, Ontario, and Quebec (Lehman et al, 1991). <u>Nevertheless, obviously hybrid phenotypic forms (that is, canids that appear intermediate between wolves and coyotes) are not found in the wild. (L.D. Mech, Nat'l Biol. Survey, pers. comm..) except possibly in southeastern Ontario (Kolenosky and Standfield 1975)</u>  There are no records of Mexican wolves interbreeding with coyotes and, while the future potential exists, the likelihood is not considered great (Brown, 1983). This potential will be further minimized by: (1) releasing mated pairs, (2) closely monitoring and studying released wolves and their offspring, (3) capturing and relocating wolves that disperse out of wolf recovery areas, and (4) re-establishing wolf populations in numbers sufficient that potential wolf maters are available for dispersing wolves. (emphasis added)

118.    In 2004, the FWS and NMDGF obtained scientific data which demonstrated that

hybridization between Mexican gray wolves and Mexican coyotes had occurred historically.

The report stated that "halpotype 60 is an historic *baileyi* is one bp different from a Mexican

coyote halpotype".   The report demonstrated that "variation in canids of Texas and New

Mexico is high"  The report demonstrated that the skull of a museum specimen wolf had wolf

dimensions, but genetic markers indicated it was a wolf-coyote hybrid.   The genetic report concluded that "Hybridization between coyotes and Mexican wolves likely occurred historically, and may be a problem for reintroduction"   (Dr. Robert Wayne, January, 2004)

119.   The FWS and NMDGF have ignored the scientific data contained in their own files regarding hybridization between wolves and coyotes, and have withheld such information from Plaintiffs and the general public, continuing to assert that there is no evidence of this type of hybridization.

120.   The FWS has misrepresented the hybridization issue in its 2010 Conservation Assessment, stating "Hybridization between red wolves and coyotes has required intense management by the red wolf program (USFWS 2007), but so far has not been a significant factor for the Mexican wolf." (C.A. at 121)

121.   The FWS continues to assert that "no hybridization events between Mexican wolves and coyotes have been documented." (C.A. pg. 58).

122.   Catron County's wolf investigator has previously provided tissue samples to FWS personnel that indicated hybridization was occurring, and requested genetic testing.   Catron County officials were subsequently informed that the genetic material was discarded and genetic testing was not conducted.

## COUNT I - VIOLATION OF NEPA

123.   The Defendants' efforts to leave problem wolves in both the primary and secondary recovery areas, was never part of the original proposed action and, was not a practice

contemplated or condoned in the FEIS or Final Rule. It is a "substantial change" justifying the need to prepare an entirely new EIS.

124.    Leaving problem habituated wolves and depredating wolf packs in the wild and artificially maintaining them indefinitely, in order to keep them from depredating for extended periods of time, was not analyzed, discussed, and commented upon in the 1996 NEPA process, Draft Environmental Impact Statement, Final Environmental Impact Statement or the 1998 Final Rule regarding Mexican wolf recovery.

125.    Although neither the Rule or the Recovery plan have been updated through the appropriate procedural process set forth in NEPA and the ESA, USFWS has undertaken to implement practices that deviate substantially from the analyzed pattern of response detailed in the EIS alternative A and Final Rule particularly where it refers to problem wolf definition and management.

126.    USFWS arbitrarily determines which management methods to implement and which to ignore and continues to violate the Final Rule and EIS that requires them to remove and or control (but not leave on the ground) problem depredating wolves.

127.    Leaving problem wolves on the ground is an arbitrary and capricious deviation of the rule and this discrete act that was not analyzed in the EIS nor even suggested as an alternative management practice in the final Rule. It was never analyzed under NEPA and represents a major federal action and management change requiring Rule change before implementation.

128.    Contrary to the economic predictions set forth in the FEIS, and as a direct and proximate result of the arbitrary and capricious management actions by the USFWS as set forth above, ranches in the reintroduction area have gone out of business.

129.    Additionally it is widely recognized in the FWS that the definition of the breeding pair must be changed through rule change, however, the agency appears to be arbitrarily ignoring the definition of problem wolf when applying control measures.

130.    USFWS and NMDGF have failed or refused to budget adequate resources to conduct accurate population counts of the Mexican gray wolf, and there is a direct correlation between the reduced area searched for uncollared wolves and the lower numbers of uncollared wolves reported by the agencies since December, 2006.

131.    FWS and NMDGF have deliberately engaged in a pattern of withholding scientific evidence of hybridization and the threat of hybridization to the reintroduction program and the social and economic effects of hybrid wolf-like animals on citizens living with the reintroduction area.

132.    Before the initial release of Mexican wolves in the wild there were 114 captive bred wolves in the captive breeding population. By July 31, 2008, the captive breeding program included 327 animals maintained at 47 facilities in the United States and Mexico. See Mexican Wolf International Studbook 2008 (Siminski 2008a, page 25).

133.    The Mexican Wolf Species Survival Plan (SSP) captive management program. The SSP maintains the goal of housing a minimum of 240 wolves in captivity at all times to

ensure the security of the species in captivity, while still being able to produce surplus animals for reintroduction.

134.    There is no shortage of wolves available for release and or translocation should the court determine the problem wolves associated with the Middle Fork, San Mateo, and Paradise, or other wolves engaged in a pattern of repeated depredations, be removed in accordance with the Final Rule and FEIS.

135.    This action and required compliance with the original terms of the Final Rule are in the best interests of the wolf recovery program and the residents of the BRWRA. This action would create a new slate of captive bred wolves with no habitual behaviors.

136.    The National Environmental Policy Act (NEPA) and its implementing regulations, 40 C.F.R. §§ 1501.3 and 1508.9, require federal agencies to analyze the foreseeable environmental impacts, including direct, indirect, and cumulative impacts, of "major federal actions." 42 U.S.C. § 4332(c)(I); 40 C.F.R. 1508.7.

137.    USFWS decisions to leave depredating and problem wolves on the landscape in violation of the 10j Rule is a major federal action as defined by NEPA.

138.    Under NEPA, if an agency proposes any "major Federal action significantly affecting the quality of the human environment", it must prepare and FEIS to consider the environmental consequences of the proposed action. 42 U.S. C. § 4332(2)(c).

139.    On information and belief, Defendants have prepared neither an EA nor an EIS for their decisions to alter the Mexican Gray Wolf Recovery Program with regard to removal decisions, population counts, and hybridization factors, as required by NEPA.

140.    If Defendants have prepared an EA or EIS, they have not released the same to the public for comment and public scoping.

141.    Defendants' decision to forego environmental review violates NEPA, and is arbitrary, capricious, and not in accordance with procedures required by law, in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A) and (D).

142.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

143.    The relief requested in this case is necessary to preserve the *status quo*, to prevent illegal agency action, and to forestall irreparable injury to the Plaintiffs.

144.    The decisions by USFWS on removals issued in 2009 are interpretative rules, having a substantial impact on the rights of individuals, subjecting them to judicial review.

145.    Defendants have a non-discretionary duty to ensure that the Final Rule for the Reintroduction Program provides for conservation of the Mexican wolf.

146.    Defendants have violated and are violating NEPA, 42 U.S.C. § 4332(2)(c), by taking actions far outside the scope and intent of the 10j Rule, which actions are arbitrary and capricious

147.    Defendants have violated and are violating NEPA, 42 U.S.C. § 4332(2)(c) by proceeding with alterations to the recovery program without preparing and circulating an EIS or an EA.

148.    The New Mexico Department of Game and Fish (NMDGF) has a mandate and authority for management of all protected wildlife resources that are held as a public trust for the people of New Mexico.

149.    The State of New Mexico has accepted and used federal funds in its participation in the management of the Mexican Gray Wolf Recovery Program, and has a duty to comply with the dictates of NEPA.

150.    NMDGF has engaged in a pattern and practice of underfunding and understaffing the wolf reintroduction project in New Mexico, resulting in violations of the intent of the Final Rule and FEIS.

151.    NMDGF has violated principles of environmental justice by participating in the rules violations and underfunding and understaffing its participation in the reintroduction program

## COUNT II – INJUNCTIVE RELIEF

152.    Unless Defendants are enjoined from further deviations from the 10j Rule and FEIS in violation of NEPA and applicable rules, Plaintiffs will be irreparably damaged.

153.    Plaintiffs have no speedy or adequate remedy at law if denied injunctive relief.

154.    The Court should issue a Preliminary Injunction and Temporary Restraining Order enjoining and restraining the Defendants from violating the provisions of the 10(j) Rule.

155.    On information and belief, no harm or damage will be incurred or suffered by the Defendants by the issuance of a the Preliminary Injunction and Temporary Restraining Order,

## COUNT III – AWARD OF ATTORNEY'S FEES

156.    The ESA contains a citizen suit provision which allows "any person to commence a civil suit in his own behalf against the Secretary where there is alleged failure of the Secretary to perform any act or duty under Section 1533 which is not discretionary with the Secretary. 16 U.S.C. § 1540(g)(1)(c).

157.   Plaintiffs are entitled to an award of attorney's fees under the ESA and the Equal Access to Justice Act, 5 U.S.C. § 504.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to grant the following relief:

1.   Enter a declaratory judgment declaring unlawful the Defendants' deviation from the 10j Rule and FEIS as violations of NEPA, 43 U.S.C. § 4332(2)(c);

2.   Enter a preliminary injunction enjoining Defendants from proceeding with any management decisions which violate the 10j Rule and FEIS pending the trial of this action;

3.   Enter a permanent injunction enjoining Defendants from proceeding with any management decisions which violate the 10j Rule and FEIS until Defendants have caused to be prepared and circulated for public and interagency comment an adequate Draft and Final Environmental Impact Statement identifying and discussing in detail the impacts of and the alternatives to the proposed Project in accordance with NEPA, 43 U.S.C. § 4332(2)(c);

4.   Enter an order requiring Defendants to fully fund the required actions on wolf removals and population counts;

5.   Enter an order awarding Plaintiff reasonable attorney's fees, interest, and costs incurred in this action, pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and other applicable laws; and

6.   Issue such other and further relief as this Court deems just and appropriate

RESPECTFULLY SUBMITTED,

**BRYANT, SCHNEIDER-COOK LAW FIRM, P.A.**

_____

Daniel A. Bryant
Bryant, Schneider-Cook Law Firm
159 Mescalero Trail, Ste. 8
Ruidoso, New Mexico 88345
575.258.5546
575.802.2202 facsimile